# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SANDRA LOSURDO, Individually and as Administratrix of the Estate of WILLIAM A. LOSURDO, deceased, ADAM LOSURDO, and NICOLE SACCO,

        Plaintiff,

  v.

VIACOMCBS INC., *et al*.,

        Defendants.

Civil Action No. 21-cv-1965 (JXN)(LDW)

## <u>OPINION</u>

<u>**NEALS**</u>, District Judge

       This matter comes before the Court upon Defendant General Electric Company's ("GE") motion for summary judgment (ECF No. 174) and Defendant Paramount Global's (f/k/a ViacomCBS, Inc., f/k/a Westinghouse Electric Corporation) ("Westinghouse")[1] motion for summary judgment (ECF No. 175), pursuant to Federal Rule of Civil Procedure 56. Plaintiffs Sandra Losurdo, individually and as administratrix of the Estate of William A. Losurdo, deceased, Adam Losurdo, and Nicole Sacco (collectively, "Plaintiffs") filed opposition to each motion (ECF Nos. 192, 193), to which Defendants GE and Westinghouse replied (ECF Nos. 194, 195). Jurisdiction and venue are proper pursuant to 28 U.S.C. § 1333 and 1441(a), respectively. The Court has considered the parties' submissions and held oral argument on November 2, 2023. For the reasons set forth below, GE and Westinghouse's motions for summary judgment (ECF Nos.

---

[1] "Paramount Global (a Delaware corporation formerly known as ViacomCBS Inc.; as CBS Corporation; and as Viacom, Inc.) is a successor by merger to CBS Corporation (a Pennsylvania corporation formerly known as Westinghouse Electric Corporation." (ECF No. 175-2 at 1 n.1).

174, 175) are **GRANTED in part** as to Plaintiffs' claims for punitive damages and loss of consortium damages. All other claims for relief are **DENIED**.

## I.    BACKGROUND

This case arises from William A. Losurdo's death from mesothelioma caused by exposure to asbestos. (Plaintiffs' Statement of Disputed Material Facts (ECF No. 191) ("PSOMF") ¶ 2; Westinghouse's Response to Plaintiffs' Statement of Disputed Material Facts (ECF No. 194-9) ("WRSOMF") ¶ 2; GE's Response to Plaintiffs' Statement of Disputed Material Facts (ECF No. 195-1) ("GERSOMF") ¶ 2).[2]

Mr. Losurdo enlisted in the Naval Reserve on August 2, 1967, and served on active duty in the United States Navy from February 11, 1969, through November 13, 1970. (PSOMF ¶¶ 8, 10; WRSOMF ¶¶ 8, 10; GERSOMF ¶¶ 8, 10). While on active duty, he was assigned to the U.S.S. *Mississinewa* (the "*Mississinewa*"). (PSOMF ¶ 11; WRSOMF ¶ 11; GERSOMF ¶ 11). The *Mississinewa* was an oil tanker that was "responsible for refueling [war] ships at sea . . . so that those ships [did not have to] continually come back into port." (PSOMF ¶ 13; WRSOMF ¶ 13; GERSOMF ¶ 13).

On the *Mississinewa*, Mr. Losurdo served as a deckhand for his first three months aboard. (PSOMF ¶ 17; WRSOMF ¶ 17; GERSOMF ¶ 17). In this role, Mr. Losurdo chipped paint and swabbed the decks. (*Id.*) Thereafter, for his remaining eighteen months aboard the *Mississinewa*, Mr. Losurdo was promoted and classified as a "petty officer, third class storekeeper." (PSOMF ¶¶ 15-16; WRSOMF ¶¶ 15-16; GERSOMF ¶¶ 15-16). His primary responsibilities included (i)

---

[2] For the sake of brevity, all citations to the parties' Rule 56.1 statements incorporate the evidentiary citations contained therein. The Court sets forth only those material facts necessary to decide the motion. All facts are undisputed unless otherwise noted. Because GE and Westinghouse's statements of undisputed material facts often overlap and Plaintiffs submit a consolidated statement of material facts in opposition to both Motions, the Court discusses the material facts relevant to both Motions together.

"[p]rocessing requisitions from the different departments around the ship" (ii) "[m]aking sure those orders were processed[]"; (iii) "[w]hen the orders came in, . . . if it was able to be handled by [Mr. Losurdo], obviously [he] would carry to the different portions of the ship" or utilize "other means to get it"; and (iv) overseeing the ship's budget. (*See* Certification of Andrew J. Dupont ("Dupont Cert."), Ex. 3, ECF No. 191-3 at 19:2-13).

In March 1970, the *Mississinewa* experienced mechanical problems while en route to Puerto Rico and became marooned off the coast of Norfolk, Virginia. (Dupont Cert., Ex. 4, ECF No. 191-4 at 72:3-19).[3] The *Mississinewa* was hauled to the Boston Naval Shipyard to undergo repairs. (*Id.*) Mr. Losurdo spent the remaining eight (8) months of his active-duty service, through November of 1970, aboard the *Mississinewa*, and in drydock at Boston Naval Shipyard. (*Id.* at 72:19-22).

While the *Mississinewa* was at the Boston Naval Shipyard, Mr. Losurdo observed "a flurry of activity going on down in the engine room and boiler room . . . focused on getting the ship up and running again," (Dupont Cert., Ex. 3, ECF No. 191-3 at 30:1-13). As storekeeper, Mr. Losurdo entered the engine room of the *Mississinewa* three to four times per week and would spend anywhere from thirty to sixty minutes each time. (*Id.* at 31:3-4, 32:19-20). Mr. Losurdo would be fifteen to twenty feet from the equipment (*id.* at 32:13-14) and observed "[d]rilling, cutting, [and] particles flying around." (*Id.* at 105:15-17).

---

[3] GE and Westinghouse contend the Navy records show the *Mississinewa* did not arrive to the Boston Naval Shipyard until later. According to GE, the *Mississinewa* did not arrive to the Boston Naval Shipyard until October 21, 1970. (*See* GERSOMF ¶ 23). According to Westinghouse, the *Mississinewa* did not begin the overhaul until August 29, 1970. (*See* WRSOMF ¶ 23). The Court affords all reasonable inferences to Plaintiffs as the non-moving parties and finds the timing of when the *Mississinewa* arrived at the Boston Naval Shipyard constitutes a genuine dispute of material fact as to the amount of time Mr. Losurdo may have been exposed to the asbestos-integrated products.

Mr. Losurdo testified that even when he was in his office, he was only located four feet from the entrance to the engine room. (Dupont Cert., Ex. 4, ECF No. 191-4 at 69:1-10).[4] Mr. Losurdo further testified: "when you opened up the compartment door to go down into the boiler room, . . . dust was flying because they were probably sawing, you know, or they were sawing equipment apart, the bad equipment[.]" (*Id.* at 91:9-14). While Mr. Losurdo was unable to identify the specific equipment, he testified that he saw "large pieces of equipment" being sawed. (*Id.* at 91:16-24).

The *Mississinewa* was equipped with two main propulsion turbines manufactured by GE (*see* Dupont Cert., Ex. 11, ECF No. 191-11 at 21:15-23), and three (3) ship service turbine generators ("SSTGs") manufactured by Westinghouse. (*See* Dupont Cert., Ex. 9, ECF No. 191-9 at 37:11-22). Plaintiffs allege that the propulsion turbines and SSTGs required the installation of asbestos materials on their equipment. (*See* ECF No. 126-3 at ¶ 10). Plaintiffs claim Mr. Losurdo was exposed to asbestos while on the *Mississinewa*. (*See generally id.*).

In August 2020, Mr. Losurdo was diagnosed with mesothelioma. (*See* Dupont Cert., Ex. 4, ECF No. 191-4 at 154:12-20). Mr. Losurdo died as a result of his mesothelioma on January 15, 2022. (*See* Dupont Cert., Ex. 2, ECF No. 191-2).

Plaintiffs filed suit against multiple companies and manufacturers of parts and machinery on the *Mississinewa* under theories of negligence and strict liability. The two remaining defendants, GE and Westinghouse, both move for summary judgment. (ECF Nos. 174, 175).

---

[4] The Court recognizes GE disputes the proximity of Mr. Losurdo's office to the engine room. (*See* GERSOMF ¶ 31). However, the Court finds this factual dispute further supports a genuine dispute of material fact regarding substantial causation.

Plaintiffs filed oppositions (ECF Nos. 192, 193)[5], to which Defendants Westinghouse and GE replied (ECF Nos. 194, 195). The motions are now ripe for resolution.

## II.    LEGAL STANDARD

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The substantive law identifies what facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (citation omitted).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *See Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court will not "weigh the evidence and determine the truth of the matter," but will determine whether a genuine dispute necessitates a trial. *Anderson*, 477 U.S. at 249. Nor will the Court "resolve factual disputes or make credibility determinations." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)). Although the moving party bears the initial burden of showing the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine [dispute] for trial."

---

[5] On February 21 and 22, 2023, Plaintiffs filed opposition to GE and Westinghouse's motions. (ECF Nos. 183, 184, 185). Thereafter, on February 24, 2023, Plaintiffs moved for leave to file corrected oppositions, pursuant to Local Civil Rule 6.1(b). (ECF No. 186). On February 27, 2023, the Court granted Plaintiffs' motion. (ECF No. 188). As such, the Court considers Plaintiffs' corrected oppositions for purposes of this Opinion.

*Anderson*, 477 U.S. at 250. The Court must grant summary judgment if the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine dispute of material fact exists. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Furthermore, "a party does not raise a genuine [dispute] of material fact by speculation and conclusory allegations." *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 210 (D.N.J. 2001) (citation omitted).

### B. Applicability of Maritime Law

GE and Westinghouse contend, which Plaintiffs do not dispute, that maritime law applies to Plaintiffs' claims of alleged exposure on the *Mississinewa*. (GE Br. at 17; Westinghouse Br. at 18-19). This Court has previously held that maritime law applies where, as here, plaintiffs allege asbestos exposure to turbines in the engine rooms of Navy ships while docked at naval shipyards. *See Feaster v. A.W. Chesterton Co.*, No. 14-3417, 2015 WL 9308341, at *3-5 (D.N.J. Dec. 22, 2015) (citing *Deuber v. Asbestos Corp.*, No. 10-78931, 2011 WL 6415339, at *1 (E.D. Pa. Dec. 2, 2011)); *accord Young v. John Crane, Inc.*, No. 21-4493, 2024 WL 5455645, at *1 n.1 (E.D. Pa. June 11, 2024) (applying federal maritime law to mesothelioma suit brough by heir of civilian employee who was allegedly exposed to asbestos at the Philadelphia Naval Shipyard); *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) (applying federal maritime law to mesothelioma suit brought by heirs of a Navy sailor who was allegedly exposed to asbestos while serving aboard naval ships); *Edmonds v. Air & Liquid Sys. Corp.*, No. 22-825, 2025 WL 81345, at *6 n.5 (M.D. Fla. Jan. 13, 2025) (same). Here, the Court similarly finds maritime law applies.[6]

---

[6] Under maritime law, the Court considers the "prevailing view" on land and draws from the law of the state in which it sits. *See, e.g.*, *Pan–Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129, 1134 (9th Cir. 1977). Under New Jersey law, "to prevail against a particular defendant in an asbestos case, a plaintiff must establish, in addition to other elements of a product liability action, exposure to friable asbestos manufactured or distributed by the defendant." *Sholtis v. Am. Cyanamid Co.*, 568 A.2d 1196, 1208 (N.J. Super. Ct. App. Div. 1989); *see also Goss v. Am. Cyanamid, Co.*, 650 A.2d 1001, 1005 (N.J. Super. Ct. App. Div. 1994) (noting that in asbestos exposure tort claim, the plaintiff must demonstrate exposure to a defendant's asbestos containing product). In an asbestos failure to warn

"With admiralty jurisdiction comes the applicability of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986) (citing *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 255 (1972)). However, "exercise of admiralty jurisdiction does not result in the automatic displacement of state law." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 545 (1995). "[F]ederal admiralty courts sometimes do apply state law." *Id.* at 546 (citations removed). "In particular, state law may be used to supplement federal maritime law so long as it [is] 'compatible with substantive maritime policies.'" *Spurlin v. Air & Liquid Sys. Corp.*, 537 F. Supp. 3d 1162, 1168 (quoting *Yamaha Motor Corp. U.S.A. v. Calhoun*, 516 U.S. 199, 207 (1996)). Typically, courts will not apply state law where it would be "inconsonant with the substance of federal maritime law[.]" *Calhoun*, 516 U.S. at 207.

## III.  **DISCUSSION**

In support of their motions for summary judgment, GE and Westinghouse submit substantially similar arguments.[7] GE and Westinghouse both move for summary judgment on the basis that they did not owe Mr. Losurdo a duty to warn under the Supreme Court's decision in *Air & Liquid Systems Corp. v. DeVries*, 586 U.S. 446 (2019). (GE Br. at 26-36; Westinghouse Br. at 19-27). GE and Westinghouse next argue that Plaintiffs have failed to establish a genuine dispute of material fact as to whether Defendants' products were a substantial factor in causing Mr. Losurdo's mesothelioma and subsequent death. (GE Br. at 17-22; Westinghouse Br. at 28-31). GE and Westinghouse also contend that the government contractor defense bars Plaintiffs' claims.

---

claim, liability may attach only where a plaintiff identifies an asbestos-containing product manufactured or supplied by the defendant. *Hughes v. A.W. Chesterton Co.*, 89 A.3d 179, 190 (N.J. Super. Ct. App. Div. 2014). Courts in this District have followed suit. *See Barnes v. Foster Wheeler Corp.*, No. 13-1285, 2014 WL 2965699, at *3 (D.N.J. June 30, 2014) (collecting and discussing cases); *Thomasson v. Air & Liquid Systems Corp.*, No. 13-1034, 2015 WL 1639730 (D.N.J. April 9, 2015).

[7] The Court at times will refer to GE and Westinghouse collectively as Defendants and simultaneously address their similar arguments.

(GE Br. at 36-42; Westinghouse Br. at 31-36). Finally, GE and Westinghouse argue they are entitled to summary judgment on the Plaintiffs' loss of consortium cause of action and claim for punitive damages. (GE Br. at 42-46; Westinghouse Br. at 36-40). The Court addresses each argument, in turn.

A. **Genuine Disputes of Fact Exist as to GE and Westinghouse's Duty to Warn Mr. Losurdo.**

GE and Westinghouse argue that they are entitled to summary judgment because, under the standard articulated by the Supreme Court in *Air & Liquid Systems Corp. v. DeVries*, 586 U.S. 446, 457 (2019), they had no duty to warn Mr. Losurdo regarding the dangers of asbestos. (GE Br. at 26-36; Westinghouse Br. at 19-27). In the context of maritime torts, the Supreme Court has elucidated that an equipment manufacturer has a duty to warn when: (1) "its product requires incorporation of a part [that makes the integrated product dangerous for its intended uses]"; (2) "the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses"; and (3) "the manufacturer has no reason to believe that the product's users will realize that danger." *Id.*

According to GE, Plaintiffs cannot establish any of these factors as they apply to their turbine claims, and therefore, their claims against it fail as a matter of law. (GE Br. at 26-36). According to Westinghouse, Plaintiffs cannot establish the first and third *DeVries* factors as it applies to the insulation-related claims (Westinghouse Br. at 19-24) and the second *DeVries* factor as it applies to the gasket-related claims. (*Id.* at 24-27). The Court considers each factor of the *DeVries* test in turn and concludes that genuine disputes of material fact preclude summary judgment as to whether GE and Westinghouse had a duty to warn Mr. Losurdo regarding the dangers of asbestos.

## 1. <u>Required Incorporation of a Part</u>

In *DeVries*, the Supreme Court clarified that a product requires incorporation of a part when "(i) a manufacturer directs that the part be incorporated; (ii) a manufacturer itself makes the product with a part that the manufacturer knows will require replacement with a similar part; or (iii) a product would be useless without the part." *DeVries,* 586 U.S. at 457 (internal citations omitted).[8]  "It is the fact that the part contributes to the overall danger of the product that is the key to this prong, not just that the product requires a certain non-dangerous part." *In re Asbestos Prods. Liab. Litig.*, 547 F. Supp. 3d 491, 491 n.1 (E.D. Penn. 2021).  "[T]he 'required test' announced in *De[V]ries* is disjunctive and non-exhaustive" and "any one of the circumstances listed will satisfy the test." *In re Asbestos Litig.*, No. 19-548, 2021 WL 3025842, at *6 (D. Del. July 16, 2021) (internal citations omitted).  The Court finds that there are triable issues of fact whether GE and Westinghouse directed the use of asbestos-containing parts.  Since Plaintiffs only need to establish a triable issue on *one* of the three scenarios presented in *DeVries* to satisfy this prong, the Court focuses on the "directed use" scenario.

The Court first addresses Defendants' arguments that Plaintiffs fail to satisfy the first *DeVries* element because it was the Navy, not them, that required the incorporation of asbestos parts.  (*See* GE Br. at 29; Westinghouse Br. at 21-22).  The Court disagrees.  Like the present action, *DeVries* involved allegations that equipment manufacturers failed to warn of the dangers of exposure to asbestos-containing parts that the Navy required to be used with its products.  586

---

[8] As noted in this District in *Hammell v. Air & Liquid Sys. Corp.,* 2020 WL 5107478, at *5 (D.N.J. Aug. 31, 2020), in *DeVries,* the Supreme Court cited *Bell v. Foster Wheeler Energy Corp.*, No. 15-6394, 2016 WL 5780104, at *6-7 (E.D. La. Oct. 4, 2016). The *Bell* court held that "a manufacturer of a finished product that incorporates asbestos components" is liable in both strict liability and negligence actions where "the harm is caused by an asbestos component added to the product by the manufacturer." *Bell*, 2016 WL 5780104, at *6. Where "the harm is caused by an aftermarket asbestos component," the product manufacturer is not liable in a strict liability action, but "may still be liable under a negligence theory if a breach of the duty to warn regarding the original asbestos components that the manufacturer added to the product is a proximate cause of the subsequent harmful exposure to asbestos contained in an aftermarket replacement part." *Id.*

U.S. at 449. There, the defendants sold much of their equipment to the Navy "in a condition known as 'bare-metal,' . . . [and] the Navy later added the asbestos to the equipment." *Id.* at 450. "Despite its recognition that the Navy required incorporation of asbestos [in]to the products, however, the Supreme Court made no indication that the Navy's directive would be fatal to the duty-to-warn inquiry." *Spurlin*, 537 F. Supp. 3d at 1169 (citing *DeVries*, 586 U.S. at 449). Accordingly, the Court declines to find GE and Westinghouse's contention that it was the Navy, rather than the manufacturers, who required the usage of asbestos parts, to be dispositive. *See id.*

Courts have found a genuine dispute of material fact as to whether the manufacturer directed the Navy to incorporate asbestos-containing parts into its equipment, where the design drawings or manuals include asbestos-containing products. *See Hammell*, 2020 WL 5107478, at *6 (finding Foster Wheeler's inclusion of asbestos-containing products in its design drawings created a genuine dispute, despite Foster Wheeler's argument that the Navy originally specified inclusion of those parts); *Gehant v. Foster Wheeler Energy Corp.*, No. 20-381, 2022 WL 626770, at *4 (E.D. Va. Mar. 3, 2022) (finding a "triable issue of fact as to whether the boiler manual directed the Navy to incorporate asbestos-containing parts into [Foster Wheeler]'s boilers" where the manual "included diagrams with asbestos-containing cement and gaskets). The present action presents similar facts, which are uncontested by Westinghouse. "[A]s part of the deliverable" with the SSTGs, Westinghouse purchased valves that were wrapped with "graphite impregnated asbestos" packing that had been designed to prevent burning. (PSOMF ¶ 42; WRSOMF ¶ 42). Additionally, the insulation listed on Westinghouse's drawings for the SSTGs contained (i) thermal block insulation, which at the time the ship was constructed included asbestos thermal block insulation as one of the insulations; (ii) asbestos felt; (iii) cement insulation, cement finish and cement adhesive, which was asbestos cement; (iv) asbestos cloths; and (v) asbestos yarn.

(PSOMF ¶ 45; WRSOMF ¶ 45). Further, the SSTG drawings required "rails to hold the asbestos on . . . as part of the manufacturing process." (PSOMF ¶ 46; WRSOMF ¶ 46). Additionally, pursuant to the military specifications that shipyards had utilized to insulate Westinghouse's equipment, "the primary . . . source of material used to insulate Westinghouse's SSTGs was 'asbestos-type insulation.'" (PSOMF ¶ 47; WRSOMF ¶ 47). As such, the Court finds, given the uncontradicted facts pertaining to the SSTG drawings, there is a triable issue of fact whether the SSTG required the usage of asbestos insulation.

With respect to GE, Arthur J. Howenstein, General Electric's corporate designee, testified that GE had knowledge that the Navy could use asbestos-containing material on "[a]nything which was on the 513E-275 heat retention drawing in any areas above 125 degrees F[ahrenheit]." (Dupont Cert., Ex. 11, ECF No. 191-11 at 28:17-24). Additionally, Howenstein testified that the heat retention drawings showed asbestos could have been utilized for the high-pressure section of the propulsion turbine. (*Id.* at 29:1-21). Further, Captain Burger testified that asbestos insulation was also used on the low-pressure side of the propulsion turbines because the steam exhausted from the high-pressure side to the low-pressure side was at a temperature of up to 500 degrees Fahrenheit. (Dupont Cert., Ex. 6, ECF No. 191-6 at 98:23 to 100:17). Affording all reasonable inferences to Plaintiffs, as the non-moving party, the Court finds that there are genuine disputes of material fact whether the GE propulsion turbines required the usage of asbestos insulation.

Accordingly, the Court finds there are genuine disputes of material fact as to the first element of the *DeVries* test.

### 2. **The Manufacturer Knows or Has Reason to Know that the Integrated Product is Likely to be Dangerous for Its Intended Uses.**

Westinghouse contends that Plaintiffs are unable to prove that either Westinghouse or the Navy knew or had reason to know at the time of Mr. Losurdo's service that the usage of asbestos

gaskets for its SSTGs rendered Westinghouse's SSTGs dangerous.[9]  (Westinghouse Br. at 24-27).  In a similar vein, GE argues it would not have known or had any reason to know that "bystander shipfitter work around an integrated turbine (with someone else's insulation on it) would cause asbestosis, let alone lung cancer or mesothelioma."  (GE Br. at 32-34).  Plaintiffs argue there is sufficient record evidence to demonstrate that both Defendants knew or had reason to know that the integrated products were likely to be dangerous.  (Opp'n to Westinghouse Br. at 13-14; Opp'n to GE Br. at 18-19).

The Court finds there is sufficient record evidence demonstrating a genuine dispute of material fact as to whether Westinghouse, GE, and the Navy knew or had reason to know that the integrated products were likely to be dangerous.  For instance, Candace Tsai, MS, Sc.D., CIH, Plaintiffs' industrial hygienist, stated, in pertinent part:

---

[9] As part of its argument, Westinghouse urges the Court to decline to follow the holding in *Hammell,* that "an equipment manufacturer can be held liable under *DeVries* upon mere proof that it knew that asbestos was hazardous and that some amount of asbestos exposure – no matter how brief, and no matter how *de minimis* – would result from the third-party asbestos product's use" as "plainly erroneous."  (Westinghouse Br. at 25).  In *Hammell*, the Honorable Michael A. Shipp, U.S.D.J. rejected Westinghouse and another manufacturer's argument that "it is not enough for them to know that asbestos is dangerous, but that [p]laintiff must be able to show [the d]efendants knew their integrated products—the FDBs or boilers—were dangerous."  *Id.* at *7.  In rejecting this argument and finding a genuine dispute as to the second element of the *DeVries* test, the *Hammell* Court elucidated:

> Here, this is a distinction without a difference. When a manufacturer knows (1) that asbestos dust is dangerous; (2) that an integrated product, used as intended, requires periodic replacement of an asbestos-containing part; and (3) that the replacement process will expose users to asbestos dust, the manufacturer has reason to know the integrated product is likely to be dangerous for its intended uses.

*Id.*

Westinghouse raised a similar argument in another asbestos case involving a Navy sailor.  *See Dennis v. Air & Liquid Sys. Corp.*, No. 19-9343, 2021 WL 3555720, at *9 n.15 (C.D. Cal. Mar. 24, 2021).  In *Dennis*, Westinghouse argued that the plaintiff failed to satisfy the second *DeVries* element because "maritime law now demands more than an assertion that Westinghouse knew that some types of asbestos exposure ... posed a risk" and the plaintiff had not shown that Westinghouse "knew or should have known that the use of asbestos gaskets with [Westinghouse] FDBs was, itself, a hazardous operation."  *Id.*  The court was not persuaded and citing to *Hammell* to support its proposition that there were genuine disputes of material fact.  *Id.*

The Court recognizes the sound analysis outlined in *Hammell* for the second element of the *DeVries* test.  For the reasons discussed *infra*, the Court finds there is sufficient record evidence to support genuine disputes of material fact as to whether Westinghouse knew or had reason to know that the integrated products were likely to be dangerous.

The science of industrial hygiene developed in the early 1900's because of the need to evaluate hazards and make the safe workplace in industrial society. It is clear that the hazards of working with toxic materials have been known since the early 1900's; it is also clear that the methods of controlling such hazards have also been known since then.

. . . .

The hazards of working with asbestos have been known since at least the 1930's (Merewether and Price 1930, Dreessen, DallaValle *et al.* 1938). The development of amosite felt started in 1934 when a need existed to secure a thermal insulation lighter in weight and thermally more efficient than the materials (blocks and cement or asbestos blankets) which were then being used on destroyer turbines (Fleischer, Viles et al. 1946). The Navy approved the type developed by a manufacturer in September 1934. Originally amosite was used only for turbine insulation, but it proved so satisfactory that its field of application enlarged to include insulation of valves, fittings, flanges, etc.

(Dupont Cert., Ex. 16, ECF No. 191-16 at 3, 5).  Plaintiffs also cite to a 1964 study conducted by Dr. Irving Selikoff and published in the Journal of American Medical Association, which "showed a significant increase in cancer rates of asbestos insulation workers."  (Dupont Cert., Ex. 25, ECF No. 191-25 at 7).[10]

In contrast, GE cites to the famous Fleischer-Drinker Report of 1946, Fleischer, Viler, Gade & Drinker, *A Health Survey of Pipe Covering Operations in Constructing Naval Vessels*, 28 J. Indus. Hygiene & Toxicology 9 (1946), as an example of the research developments that occurred at that time.  (*See* Certification of David S. Blow ("Blow Cert."), Ex. GG, ECF No. 174-44).   The Fleischer-Drinker Report, however, "indicated that working with asbestos insulation aboard naval vessels 'is not a dangerous occupation,' and that the Navy did not consider asbestos gaskets and packing to be hazardous during this time."  *Spurlin*, 537 F. Supp. 3d at 1178-79.

The Court recognizes that "[m]aritime asbestos litigation has been occurring across the country in recent years, often involving [GE and Westinghouse], and many courts have found that,

---

[10] The Court notes Dr. Selikoff's study is referenced in the expert report of David Y. Zhang, MD, PhD, MPH, Plaintiffs' occupational medicine and pathology expert.  (Dupont Cert., Ex. 25, ECF No. 191-25 at 7).

based on the studies available at the time, manufacturers should have known of the danger of asbestos." *Gehant*, 2022 WL 626770, at *5; *see, e.g.*, *Dennis*, 2021 WL 3555720, at *14; *Smargisso v. Air & Liquid Sys. Corp.*, No. 23-1414, 2024 WL 4297680, at *9 (N.D. Cal. Sept. 26, 2024) ("Plaintiffs present evidence that DeLaval had reason to know of the dangers of dust inhalation from working with asbestos-containing gaskets and packing in the 1930s through 1960s."); *Hammell*, 2020 WL 5107478, at *6 ("There is ample evidence that Defendants knew or should have known . . . that exposure to asbestos dust could cause asbestosis or lung cancer . . . [a]nd there is evidence Defendants knew or should have known that removing and replacing asbestos-containing gaskets could expose a user to asbestos dust."); *Spurlin*, 537 F. Supp. 3d at 1174 (finding that the publication of several studies in the 1950s and 1960s should have made companies aware of the dangers of integrated asbestos-containing parts on Navy vessels). Accordingly, there is a genuine dispute over the second element of the *DeVries* test.

### 3. The Manufacturer Has No Reason to Believe that the Product's Users will Realize the Dangers.

To establish that the product manufacturer had a duty to warn under *DeVries*, a plaintiff must also demonstrate that "the manufacturer ha[d] no reason to believe that the product's users [would] realize [the] danger" associated with using the product. *See* 586 U.S. at 449. Westinghouse contends "Plaintiffs cannot show . . . that Westinghouse had no reason to believe that Navy personnel handling asbestos would be aware of any potential hazards and would be trained and equipped to avoid those hazards." (Westinghouse Br. at 22-24). Similarly, GE argues "the affirmative evidence shows that GE had every reason to believe that the Navy was aware of the potential hazards posed by asbestos." (GE Br. at 35-36). In opposition, Plaintiffs contend that the proper inquiry is whether the end user, *i.e.*, Mr. Losurdo, would have known of the hazards. (Opp'n to GE Br. at 19-23; Opp'n to Westinghouse Br. at 15-18).

14

As a preliminary matter, the Court agrees with other district courts and Plaintiffs that the "product's *user*" in a case such as the present action includes the individual Navy sailors and personnel who actually *used* the product, as opposed to the Navy itself. *See, e.g.*, *Hipwell v. Air & Liquid Sys. Corp.*, No. 20-0063, 2022 WL 3999949, at *7 n.4 (D. Utah Aug. 31, 2022) (describing the "product's *user*" as Navy sailors and individuals who used the product); *Spurlin*, 537 F. Supp. 3d at 1174 ("The Court, however, finds that Plaintiffs have raised triable issues of fact as to whether Defendants had no reason to believe that their product's end user, that is Navy sailors, would realize the asbestos hazards to which they were exposed."); *Dennis*, 2021 WL 3555720, at *13 (finding the "'product's users' that *DeVries* refers to means the sailors using the defendants' equipment, not the Navy"); *see also Hammell*, 2020 WL 5107478, at *7 (finding there was "a dispute of material fact over whether Defendants had reason to believe the Navy *or sailors* would realize the danger of their integrated products" (emphasis added)). Indeed, "the underlying principle in *DeVries* for imposing a duty to warn was maritime law's 'special solicitude for the welfare of those who undertake to venture upon hazardous and unpredictable sea voyages.' . . . It would not be that solicitous of sailors to allow a manufacturer to skip warnings on the assumption that an intermediary (e.g., a shipowner, shipbuilder, or here, the Navy) would properly warn the sailors about them." *Dennis*, 2021 WL 3555720, at *13 (quoting *DeVries,* 586 U.S. at 456). Therefore, the appropriate inquiry is whether GE and Westinghouse had no reason to believe that the Navy sailors, such as Mr. Losurdo, would realize the danger associated with its asbestos-containing products. GE and Westinghouse's arguments on the third *DeVries* prong do not squarely address this point.

Plaintiffs cite to Mr. Losurdo's testimony that he "had no idea" that the "dust on the ship" from products that GE and Westinghouse "required be used on their equipment would result in

[him] getting mesothelioma." (Dupont Cert., Ex. 3, ECF No. 191-3 at 118:22 to 119:7). Both GE and Westinghouse's arguments focus primarily on the Navy's purported knowledge of the potential hazards, not individuals such as Mr. Losurdo. (GE Br. at 35-36; Westinghouse Br. at 22-24).

Even if the Court were to focus on the Navy's knowledge of the potential hazards, Westinghouse fails to cite to *any* record evidence to support its proposition. Similarly, GE claims the "overwhelming evidence . . . shows that Navy and its personnel were well aware of the potential hazards of asbestos and of the Navy's safe handling procedures." (GE Br. at 35-36). In support, at footnote 66 of its brief, GE directs the Court to 54 paragraphs of its Statement of Undisputed Material Facts, and numerous paragraphs have footnotes with several citations to the record. (*See* GESOMF ¶¶ 47-101).[11] Again, the extensive and voluminous record does not squarely address Mr. Losurdo's knowledge of the potential hazards. Accordingly, the Court finds there are disputes of material fact as to the third element of the *DeVries* test.

In sum, there is a genuine dispute of material fact with respect to each element of the *DeVries* test. Accordingly, the Court declines to grant summary judgment in GE and Westinghouse's favor on the basis that it had no duty to warn under *DeVries*.

---

[11] "It is not the Court's responsibility to sift through the record —let alone a voluminous record like the one here—to find evidence supporting [Westinghouse]'s position." *Dor v. TD Bank*, No. 21-18955, 2023 WL 9017558, at *10 (D.N.J. Dec. 29, 2023) (citations omitted); *see also Melissa B. v. Kijakazi*, No. ("The Court will not hunt through the voluminous record in this case to find evidence that Plaintiff believes would support additional restrictions in the RFC.") (citations omitted); *Atkins v. Comm'r Soc. Sec.*, 810 F. App'x 122, 129 (3d Cir. 2020) ("'[J]udges are not like pigs, hunting for truffles buried in the record.'" (quoting *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (internal citation omitted))); *United States v. Claxton*, 766 F.3d 280, 307 (3d Cir. 2014) ("[T]his Court has frequently instructed parties that they bear the responsibility to comb the record and point the Court to the facts that support their arguments.").

**B. A Reasonable Juror Could Conclude that Defendants' Products were a Substantial Factor in Causing Mr. Losurdo's Mesothelioma and Death.**

GE and Westinghouse next contend that Plaintiffs have failed to establish a genuine dispute of material fact whether GE and Westinghouse's products were a substantial factor in causing Mr. Losurdo's mesothelioma and subsequent death.  (GE Br. at 17-22; Westinghouse Br. at 28-31; Opp'n to GE Br. at 6-11; Opp'n to Westinghouse Br. at 19-24).  The Court disagrees.

To maintain an action for either negligence or strict liability under maritime law, Plaintiffs must establish causation.  *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488, 492 (6th Cir. 2005), *overruled on other grounds by Air and Liquid Sys. Corp. v. DeVries*, 586 U.S. 446 (2019).  "As many courts have recognized, asbestos actions present unique issues for purposes of causation[.]" *Cabasug v. Crane Co.*, 989 F. Supp. 2d 1027, 1033 (D. Haw. 2013), *abrogated on other grounds by DeVries*, 586 U.S. at 986.  "Asbestos-related diseases generally reveal themselves many years after the initial exposure, and so, plaintiffs in such cases face the herculean task of showing, usually after intervening decades, that a particular exposure to a particular asbestos-containing product was the cause of plaintiff's injury."  *Cochran v. Air & Liquid Sys. Corp.*, No. 21-9612, 2023 WL 9743379, at *5 (C.D. Cal. Dec. 7, 2023).

To establish causation, Plaintiffs must show that: "(1) [Mr. Losurdo] was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." *Lindstrom*, 424 F.3d at 492 (citing *Stark v. Armstrong World Indus., Inc.*, 21 F. App'x 371, 375 (6th Cir. 2001)).  A plaintiff may meet his specific causation burden by direct evidence that a product to which a worker has been exposed is a substantial factor in causing injury, such as through expert testimony or testimony of the plaintiff.  *See Lindstrom*, 424 F.3d at 498 (citing *Stark*, 21 F. App'x at 376).  But *Lindstrom* makes clear that expert testimony is not required, 424 F.3d at 498, rather, a plaintiff may satisfy the substantial factor test with circumstantial evidence

demonstrating "substantial exposure for a substantial period of time to provide a basis for the interference that a product was a substantial factor in causing the injury," *id.* at 492.[12] This is normally a question for the jury. *See Redland Soccer Club, Inc. v. U.S. Dep't of the Army*, 55 F.3d 827, 851 (3d Cir. 1995) (applying Pennsylvania state tort law in a non-maritime case under the Federal Tort Claims Act); *see also Czyzykowski v. F/V Ocean View, Inc.*, No. 15-2018, 2019 WL 5617046, at *6 (D.N.J. Oct. 31, 2019) (noting the substantial factor test is typically a jury issue).

Mr. Losurdo testified to the following. He (i) entered the engine room of the *Mississinewa* three to four times per week, spending anywhere from thirty to sixty minutes each time, (Dupont Cert., Ex. 3, ECF No. 191-3 at 31:3-4, 32:19-20); (ii) observed "a flurry of activity going on down in the engine room and boiler room . . . focused on getting the ship up and running again," (*id.* at 30:1-13); (iii) would be fifteen to twenty feet from the equipment, (*id.* at 32:13-14); and (iv) observed "[d]rilling, cutting, [and] particles flying around." (*Id.* at 105:15-17). Even when he was in his office, he was only located four feet from the entrance to the engine room. (Dupont Cert., Ex. 4, ECF No. 191-4 at 69:1-10).[13] Further, "when you opened up the compartment door to go down into the boiler room, . . . dust was flying because they were probably sawing, you know, or they were sawing equipment apart, the bad equipment[.]" (*Id.* at 91:9-14). While Mr. Losurdo was

---

[12] As the Third Circuit has elucidated:

> In order to defeat summary judgment in an asbestos case, New Jersey law provides that a plaintiff must adduce evidence from which "reasonable jurors could infer that sometime during [his] work histor[y] . . . plaintiff[ ] w[as] exposed to a defendant's friable asbestos frequently and on a regular basis, while [plaintiff was] in close proximity to it[,]" as well as "competent evidence, usually supplied by expert proof, establish[ing] a nexus between the exposure and plaintiff's condition."

*Haas v. 3M Co.*, 613 F. App'x 191, 194 (3d Cir. 2015) (quoting *Sholtis v. Am. Cyanamid Co.*, 568 A.2d 1196, 1208 (N.J. Super. Ct. App. Div. 1989)).

[13] The Court recognizes GE disputes the proximity of Mr. Losurdo's office to the engine room. (*See* GERSOMF ¶ 31). However, this further supports the Court's finding genuine disputes of material fact exist regarding substantial causation.

unable to identify the specific equipment, he testified that he saw "large pieces of equipment" being sawed. (*Id.* at 91:16-24).

Beyond the testimony of Mr. Losurdo, Westinghouse's corporate designee, Roy Belanger, testified that the *Mississinewa* was equipped with three SSTGs that were manufactured by Westinghouse. (Dupont Cert., Ex. 9, ECF No. 191-9 at 37:11-22). Belanger further testified that pursuant to a February 19, 1970 memorandum from the Department of Navy, work needed to be performed on one of the SSTG governors and representatives planned to visit the *Mississinewa* at Newport, Rhode Island from March 9, 1970, through March 13, 1970 "to list Number 2 SSTG set turbine cover and inspect the titanium blades." (Dupont Cert., Ex. 16, ECF No. 191-16 at 124:17-127:8). The memorandum further stated that "personnel w[ould] bring the necessary tools and do the work themselves." (Dupont Cert., Ex. 13, ECF No. 191-13).

According to Captain Burger, the removal of SSTG casings to perform inspections creates "particularly dusty conditions." (Dupont Cert., Ex. 26, ECF No. 191-26 at 5). In his opinion, "the removal of the SSTG casing would have caused the asbestos insulation to be disturbed and significant amounts of asbestos dust to be released." (*Id.*) Further, Captain Burger opined:

> The unit being lifted would require all asbestos insulation to be removed and replaced to install a new titanium rotor. This was done during Mr. Lo[s]urdo's time aboard and during the time the four (4) main turbines were lifted. It is quite probable that both the #1 and #3 ship's service generators were lifted off of their casings, since rotor corrosion had affected both main propulsion sets, and the #2 SSTG unit. It made no difference whether the salt was entering from leaking coolers or from improper boiler water treatment. In my opinion, the work required removal of all asbestos insulation and replacement of that asbestos. In my opinion, this raised asbestos dust throughout the spaces over a significant period of time, while Mr. Lo[s]urdo was living and working abroad.

(*Id.* at 6).

Mr. Hollenstein, as GE's corporate designee, testified in 1970 that the low-pressure sections of GE's propulsion turbines on the *Mississinewa* had "boiler problems and had salt water

get into . . . the turbine sections." (Dupont Cert., Ex. 11, ECF No. 191-11 at 35:14-24). Mr. Hollenstein further testified that the low-pressure sections were removed from the ship and sent to GE's service shop for "weld repair" before October 25, 1970, and were not returned to the ship until November 15, 1970, after Mr. Losurdo had left the ship. (*Id.* at 38:13-24).

In his expert report, Captain Burger opined "[b]ased on the nature of the repairs required" for the propulsion turbines, that "asbestos insulation was removed from the casing to access internal parts such as rotors and buckets" and "[t]he insulation covering the casing must have been disturbed to do this work." (Dupont Cert., Ex. 5, ECF 191-5 at 45). According to Captain Burger, these repairs would have exposed Mr. Losurdo to "asbestos containing block insulation, refractory cement, clothe, pipe covering, gaskets, packing, and other asbestos-containing products," and the debris from these materials "were removed directly across from his office space in the hallway creating clouds of dust that exposed him to asbestos." (*Id.*)

Further, Plaintiff's occupational medicine and pathology expert, Dr. Zhang, opined:

There is no reasonable dispute that exposure levels were significantly higher when workers, such as Mr. Lo[s]urdo, who routinely were in the vicinity of other workers who worked on asbestos-containing materials and equipment including engines, turbines, boilers, piping, gaskets, and insulating materials, etc. and performed this work without dust control. Therefore, taken together, the evidence and the scientific information regarding the causal relation between asbestos and mesothelioma provides more than sufficient evidence to allow one to conclude within a reasonable degree of medical and scientific certainty that Mr. Lo[s]urdo's mesothelioma was caused by that asbestos exposure, and that asbestos from General Electric and Westinghouse equipment substantially contributed to the cause of the mesothelioma.

(Dupont Cert., Ex. 25, ECF No. 191-25 at 23). During his deposition, Dr. Zhang also testified that, in his opinion, the exposure to asbestos from GE and Westinghouse's equipment caused Mr. Losurdo's malignant mesothelioma. (Dupont Cert., Ex. 38, ECF No. 191-38 at 159:20-160:3).

Dr. Tsai opined that "asbestos exposure has been known to be very high involving the removal and replacement of insulation materials, gaskets and packing relevant to those tasks occurred in the engine room." (Dupont Cert., Ex. 16, ECF No. 191-16 at 19). Dr. Tsai further opined that "Mr. Losurdo's exposures were dangerously high when he entered and presented in the engine room during the 8 months period of overhaul." (*Id.*). Dr. Tsai also testified that, given the location of the office being across the hallway from the engine room entrance, Mr. Losurdo's daily exposure was "300 times of the current exposure limit" when he was in his office. (*Id.*).

To the extent that GE and Westinghouse seek to undercut the reliability of the fact and expert testimony set forth by Plaintiffs, the Court finds that Plaintiffs have sufficiently demonstrated there is a genuine dispute as to whether GE and Westinghouse's products were a substantial factor in causing Mr. Losurdo's mesothelioma. *See Phelps v. CBS Corp.*, No. 17-8361, 2020 WL 7028954, at *15 (S.D.N.Y. Nov. 30, 2020) (finding the plaintiff's expert testimony and other evidence raised genuine disputes of material fact as to whether the defendant's products were substantial factor in causing the plaintiff's mesothelioma); *Berman v. Mobil Shipping & Transp. Co.*, No. 14-10025, 2019 WL 1510941, at *7-8 (S.D.N.Y. Mar. 27, 2019) (denying summary judgment in an asbestos action based on testimonial, documentary, and expert evidence sufficiently creating a genuine issue of material fact as to causation).

Moreover, there is no evidence that Mr. Losurdo was exposed to asbestos at any time or place other than during his service on the *Mississinewa*. (PSOMF ¶ 165; WRSOMF ¶ 165; GERSOMF ¶ 165). Taken together, a reasonable jury would be able to infer from Plaintiffs' evidence that exposure to GE and Westinghouse's products were each substantial factors in Mr. Losurdo's development of mesothelioma.

Accordingly, GE and Westinghouse's motions for summary judgment based on causation are denied.

### C. **Government Contractor Defense – _Boyle_ Test**

GE and Westinghouse also move for summary judgment with respect to Plaintiffs' failure to warn and design defect claims based on the government contractor defense. (GE Br. at 36-42; Westinghouse Br. at 32-36). Plaintiffs do not oppose GE and Westinghouse's motions as to the design defect claims and focus their arguments on the failure to warn claims. (Opp'n to GE Br. at 26-34; Opp'n to Westinghouse Br. at 24-32). Nevertheless, the Court finds Defendants have failed to satisfy its burden to establish that no genuine issues of material fact exist as to each element of the defense. Accordingly, summary judgment is denied as to the failure to warn and design defect claims.

The government contractor defense arose in _Boyle v. United Technologies Corporation_, 487 U.S. 500, 509 (1988), where the Supreme Court permitted the application of the defense in the context of a military procurement contract. There, a United States Marine helicopter pilot was injured after he was unable to escape from a crashed helicopter. _Id._ at 502. In applying the government contractor defense to the manufacturer defendant, the Court explained that contractors' liability for performing work for the federal government was of particular interest to the government and thus the Court reasoned the imposition of liability on government contractors would "directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price." _Id._ at 506-07. To protect this interest, the Court articulated a three-prong test under which the contractor must prove that: "(1) the United States approved the reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers

in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.

Federal district courts in this Circuit have also applied the government contractor defense to failure to warn cases. *See Faddish v. Gen. Elec. Co.*, No. 09-70626, 2010 WL 4146108, at *7 (E.D. Pa. Oct. 20, 2010); *Crespo v. Unisys Corp.*, No. 94-2339, 1996 WL 875565, at *15-*17 (D.N.J. June 21, 1996). "'As to the first and second prongs, in a failure to warn context, . . . the defendant must show that the government issued reasonably precise specifications covering warnings—specifications that reflect a considered judgment about the warnings at issue.'" *Hammell*, 2020 WL 5107478, at *7 (quoting *Duenas v. Gen. Elec. Co.*, MDL No. 875, No. 12-60040, 2014 WL 345232, at *5 n.1 (E.D. Pa. Jan. 29, 2014)). "Government approval of warnings must 'transcend rubber stamping' to allow a defendant to be shielded from state law liability." *Sellers v. Air & Liquid Sys. Corp.*, MDL No. 875, No. 12-60157, 2014 WL 6736347, at *1 n.1 (E.D. Pa. Sept. 30, 2014) (quoting *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783 (E.D. Pa. 2010)). "'[T]he third prong . . . may be established by showing that the government knew as much or more than the defendant contractor about the hazards of the product.'" *Hammell*, 2020 WL 5107478, at *5 (quoting *Duenas*, 2014 WL 345232, at *6 n.1).

As the Third Circuit has elucidated, "[t]he defendant bears the burden of proving each element of the defense." *Carley v. Wheeled Coach*, 991 F.2d 1117, 1125 (3d Cir. 1993). "[T]o prevail on summary judgment as to the government contractor defense, Defendants would have to show the absence of a genuine issue of material fact as to all three (3) prongs of the *Boyle* test." *Willis v. BW IP Int'l Inc.*, 811 F. Supp. 2d 1146, 1157 (E.D. Pa. 2011); *Hammell*, 2020 WL 5107478, a *7 ("'[A] defendant asserting the government contractor defense has the

burden of showing the absence of a genuine dispute as to any material fact regarding whether it is entitled to the . . . defense.'" (quoting *Duenas*, 2014 WL 345232, at *6 n.1)).

### 1. <u>Design Defect Claims</u>

In their respective Motions, GE and Westinghouse both outline the applicable elements for the government contractor defense as it applies to design defect claims. (*See* GE Br. at 37-38; Westinghouse Br. at 32). However, both GE and Westinghouse fail to set forth sufficient evidence that there are no genuine disputes of material fact as to all three prongs of the *Boyle* test.

GE argues that the first two *Boyle* prongs are satisfied because "(1) the design and production of Navy turbines was subject to extensive detailed military specifications and (2) the turbines are subjected to extensive inspection and testing by U.S. Navy personnel before the Navy accepts as conforming to such specifications." (GE Br. at 40). To support these propositions, GE cites to fifteen paragraphs of its Statement of Undisputed Material Facts. (*Id.* at 40 n.69). However, several of these paragraphs cite to multiple portions of the record. (*See* GESOMF ¶¶ 89-97). As GE fails to expressly point to the record evidence that supports this propositions, and it is not the Court's responsibility to comb through the voluminous record to locate the record evidence supporting these propositions, *Dor*, 2023 WL 9017558, at *10 (citations omitted), the Court finds GE has failed to satisfy its burden of proving each of the prongs of the *Boyle* test for the design defect claims. *Carley*, 991 F.2d at 1125.

Westinghouse directs the Court to undisputed record evidence that supports the first *Boyle* prong, i.e., "any use of asbestos with [Westinghouse's] SSTGs was either mandated or heedfully considered and approached by the Navy." (Westinghouse Br. at 33). However, Westinghouse fails to cite to *any* record evidence supporting its assertion that there are no genuine disputes of material fact as to the second and third prongs of the *Boyle* test. (*Id.* at 35-36). As such, the Court

finds Westinghouse has also failed to satisfy its burden of proving there are no genuine disputes of material fact as to each of the prongs of the *Boyle* defense for the design defect claims. *Carley*, 991 F.2d at 1125.

## 2.  **Duty to Warn Claims**

GE and Westinghouse contend there are no genuine issues of material fact as to all three prongs of the *Boyle* test and are entitled to summary judgment on the government contractor defense.  (GE Br. at 36-42; Westinghouse Br. at 32-36).  Plaintiffs do not challenge GE and Westinghouse's arguments with respect to the second *Boyle* prong, i.e., whether GE and Westinghouse provided warnings in conformance with the approved warnings.  As such, the Court focuses its analysis on the first and third *Boyle* prongs.

### i.    **There are Genuine Disputes of Material Fact Regarding Whether the Government Exercised its Discretion and Approved Reasonably Precise Specifications.**

Westinghouse argues that the record evidence demonstrates that the Navy was continuously involved with the design of Westinghouse's SSTG and "form and content of all writings to be supplied" with it and that it was precluded from giving warnings without the Navy's approval.  (Westinghouse Br. at 35).  GE does not specifically address whether "the government issued reasonably precise specifications covering warnings—specifications that reflect a considered judgment about the warnings at issue," and rather focuses on the specifications as to the design of GE's turbines.  (GE Br. at 40).

Plaintiffs argue that GE and Westinghouse have failed to submit any evidence proving "beyond a question of fact" that the Government prohibited the manufacturers from providing warnings or that either manufacturer submitted warnings to the Government that were rejected.  (Opp'n to GE Br. at 27-30; Opp'n to Westinghouse Br. at 25-28).

Courts have denied motions for summary judgment on the basis that there was a triable issue of fact related to whether the Navy prohibited manufacturers from placing warnings on their products.  *See, e.g.*, *Gehant*, 2022 WL 626770, at *6 (finding there was a "triable issue of fact as to whether the government would have allowed the Defendant to place labels on its boilers warning of the dangers of asbestos"); *Willis*, 811 F. Supp. 2d at 1156 (noting that the plaintiff had produced evidence that certain military specifications required warnings and had expert testimony that disputed the defendants' contention that the Navy prohibited manufacturers from placing warnings on their products); *Dennis*, 2021 WL 3555720, at *23 (finding that there was a triable issue of fact about whether military specifications required warnings); *Various v. Various*, 856 F. Supp. 2d 703, 712-13 (E.D. Pa. 2012) (finding that there was a dispute of material fact regarding whether the Navy prohibited, permitted, or required warnings); *Osterhout v. Crane Co.*, No. 14-208, 2016 WL 10950439, at *9 (N.D.N.Y. Mar. 21, 2016) (denying summary judgment because the defendant had not proven that the Navy exercised discretion or prohibited it from providing warnings on its products); *Coulbourn v. Air & Liquid Sys. Corp.*, No. 13-08141, 2015 WL 12656236, at *9 (D. Ariz. Feb. 11, 2015) (finding that the Navy instructed contractors through the MilSpecs to provide warnings in technical materials).

Similarly, Plaintiffs have argued and put forth evidence that the Navy would have allowed a product manufacturer to put warnings on its products.  In his report, Captain Burger relied upon numerous documents regarding the incorporation of warning labels by manufacturers to products, machinery, and equipment provided to the Navy and opined that manufacturers "were instructed to and were fully capable of providing such product and material warnings without any prohibition by the U.S. Navy." (Dupont Cert., Ex. 5, ECF No. 191-5 at 24).  Further, Captain Burger opined that "the Navy historically encouraged warnings rather than discouraging or rejecting them and

did not find that warnings adversely affected its mission."  (*Id.* at 48).  In a supplemental expert report, Captain Burger further opined that "[t]he Navy neither intended to dictate warnings and safety precautions to manufacturers nor did it intend to prohibit such warnings and safety precautions.  Rather, the Navy considered the manufacturers to be experts on these matters." (Dupont Cert., Ex. 32, ECF No. 191-32 at 2).

Therefore, there is a triable issue of fact as to whether the Government would have allowed GE and Westinghouse to place labels on their products warning of the dangers of asbestos.

ii.   **There are Genuine Disputes of Material Fact Regarding Whether GE and Westinghouse Warned the Government about the Dangers Known to Them but Not the Government.**

GE and Westinghouse argue that the Navy was aware of any dangers associated with asbestos and thus had no duty to warn of any such dangers because of the Navy's awareness.  (GE Br. at 41-42; Westinghouse Br. at 36).  Plaintiffs argue that GE and Westinghouse have failed to demonstrate "beyond a genuine issue of material fact that the Navy's knowledge of asbestos hazards and protective measures was at least equal to [GE and Westinghouse]'s knowledge." (Opp'n to GE Br. at 32-33; Opp'n to Westinghouse Br. at 30-32).

Upon reviewing the record, the Court finds GE and Westinghouse have failed to demonstrate there are no genuine disputes of material fact as to whether the Navy knew as much or more than GE and Westinghouse.  First, GE and Westinghouse do not point to, and the Court has not found, any record evidence demonstrating that either GE or Westinghouse warned the Navy about any asbestos hazards when using their equipment.  Rather, as discussed *supra*, there are triable issues of fact regarding whether GE and Westinghouse knew more about the dangers that were associated with their equipment than the Navy did.  *See also Spurlin*, 537 F. Supp. 3d at 1178 (finding there was "no evidence that [the] Defendants warned the United States about

asbestos hazards in the use of their equipment"); *Willis*, 811 F. Supp. 2d at 1157 (finding the same in an asbestos multi-district litigation).

GE and Westinghouse have marshalled their own set of facts supporting the conclusion that the Navy knew as much, or more, than GE and Westinghouse.  For example, Westinghouse's expert, Dr. Samuel A. Forman, opined that "at least by the early 1940s, the Navy had become a leader in the field of occupational medicine relating to, among other things, asbestos dust inhalation exposure."  (Blow Cert., Ex. K, ECF No. 175-16 at ¶ 27).  Dr. Forman further opined that by the end of the 1950s, "Navy yards had expanded formal programs regarding asbestos control."  (*Id.* at ¶ 61).  Similarly, GE had produced a multitude of documents supporting its proposition that the Navy had been working to safeguard against occupational exposure to asbestos.  (*See, e.g.*, GESOMF ¶¶ 48-53).

However, the Court finds there is also sufficient record evidence for a reasonable jury to reach the opposite conclusion.  The evidence reveals that the Navy relied upon the erroneous Fleischer-Drinker Report, which indicated that working with asbestos insulation aboard naval vessels "is not a dangerous occupation," and that the Navy did not consider asbestos gaskets and packing to be a hazard during this time.  (Blow Cert., Ex. K, ECF No. 175-16 at 16-17).  Further, as to asbestos gaskets, neither the Navy nor anyone else believed that the usage of such products could be hazardous until the late 1970s or early 1980s – i.e., after Mr. Losurdo concluded his service on the *Mississinewa*.  (Blow Cert., Ex. D, ECF No. 175-7 at 57:2-8, 59:7-23, 61:2-7; Ex. K, ECF No. 175-16 at ¶¶ 42, 69).  Other courts have denied motions for summary judgment based on similar logic.  *See, e.g. Willis*, 811 F. Supp. 2d at 1157 (finding a genuine issue of material fact as to the third *Boyle* prong where the plaintiff had cited to the "[d]efendants' expert reports to establish that the Navy was unaware of the dangers of asbestos until the late 1960s or early

1970s"); *Spurlin*, 537 F. Supp. 3d at 1179 ("[T]he evidence gives rise to a reasonable inference that Defendants knew more about the dangers of their products than did the United States.").

Consequently, the Court finds there is a triable issue of fact as to whether the Navy was aware of the specific dangers associated with GE and Westinghouse's products and whether the Navy knew as much or more than GE and Westinghouse.

### D. Punitive and Loss of Consortium Damages

Lastly, the Court addresses Plaintiffs' claims for loss of consortium and punitive damages. GE and Westinghouse argue that summary judgment should be entered on Plaintiffs' loss of consortium and punitive damages claims because, pursuant to *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990), maritime law does not recognize such claims. (GE Br. at 42-46; Westinghouse Br. at 36-40). In opposition, Plaintiffs argue they are not precluded from seeking loss of consortium and punitive damages under maritime law. (Opp'n to GE Br. at 34-35; Opp'n to Westinghouse Br. at 32-33). The Court agrees with GE and Westinghouse.

#### 1. Loss of Consortium

In *Miles*, a mother of a seaman who had died from injuries sustained aboard the defendant's vessel raised a claim for loss of society under general maritime law. 498 U.S. at 21-22. The Supreme Court considered the damages available under wrongful death actions pursuant to the Jones Act, 46 U.S.C. § 30104, *et seq.*, and the Death on the High Seas Act ("DOHSA"), 46 U.S.C. § 30301, *et seq. See id.* at 28-33. The Supreme Court held that "the Jones Act provides an action in negligence for the death or injury of a seaman," *id.* at 29, but there was "no recovery for loss of society in a general maritime action for the wrongful death of a Jones Act seaman." *Id.* at 33. In reaching this conclusion, the Supreme Court noted it was "restor[ing] a uniform rule applicable to

all actions for the wrongful death of a seaman, whether under DOHSA, the Jones Act, or general maritime law." *Id.*

The Court stated that,

> The Jones Act evinces no general hostility to recovery under maritime law. It does not disturb seamen's general maritime claims for injuries resulting from unseaworthiness, and it does not preclude the recovery for wrongful death due to unseaworthiness created by its companion statute, DOHSA. Rather, the Jones Act establishes a uniform system of seamen's tort law parallel to that available to employees of interstate railway carriers under FELA. As the Court concluded in *Moragne* [*v. States Marine Lines, Inc.*, 398 U.S. 375, 396 n.12 (1970)], the extension of the DOHSA wrongful death action to territorial waters furthers rather than hinders uniformity in the exercise of admiralty jurisdiction.

*Id.* at 29-30. The Court concluded that, "[t]he Jones Act also precludes recovery for loss of society in this case. The Jones Act applies when a seaman has been killed as a result of negligence, and it limits recovery to pecuniary loss." *Id.* at 32.

Accordingly, Plaintiffs' loss of consortium claim is not permitted.

### 2. Punitive Damages

Plaintiffs argue that the "savings to suitors" provision, 28 U.S.C. § 1333(1), provides them with entitlement to punitive and loss of consortium damages.  (*See* Opp'n to GE Br. at 34-35; Opp'n to Westinghouse Br. at 32-33). The "savings to suitors" provision confers on federal courts original jurisdiction over "any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled," 28 U.S.C. § 1333(1), and "precludes automatic preemption of state remedies by admiralty law," *Robinson v. Alter Barge Line, Inc.*, 513 F.3d 668, 672 (7th Cir. 2008) (citations omitted).  In *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 222-23 (1986), the Supreme Court expressed:

> Stated another way, the "saving to suitors" clause allows state courts to entertain *in personam* maritime causes of action, but in such cases the extent to which state law may be used to remedy maritime injuries is constrained by a so-called "reverse-

*Erie*" doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards.

In *Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 407 (2009), the Supreme Court identified a two-step framework for determining which types of damages a plaintiff can seek under general maritime law: (1) whether the relief sought has been historically available under general maritime law, and (2) whether any statute explicitly precludes the requested relief. The Court held "an injured seaman may recover punitive damages for his employer's willful failure to pay maintenance and cure." *Id.* In reaching this conclusion, the Supreme Court expressed "[h]istorically, punitive damages have been available and awarded in general maritime actions, including some in maintenance and cure" and found "that nothing in *Miles* or the Jones Act eliminates that availability." *Id.* However, the Court explicitly distinguished between the maintenance and cure claim at issue and "wrongful-death actions" where "Congress has spoken directly." *Id.* at 406 (quoting *Miles*, 498 U.S. at 31).[14]

The Supreme Court then considered the availability of punitive damages in unseaworthiness actions in *The Dutra Group v. Batterton*, 588 U.S. 358 (2019). There, the Supreme Court reaffirmed the *Townsend* framework and added a third step based on whether "policy grounds" nevertheless compel the requested damages. *Id.* at 369. The Court elucidated, "because there is no historical basis for allowing punitive damages in unseaworthiness actions, and in order to promote uniformity with the way courts have applied parallel statutory causes of action, we hold that punitive damages remain unavailable in unseaworthiness actions." *Id.* at 361. Enunciating its rationale, the Court commented, "In *Exxon Shipping Co. v. Baker*, 554 U.S. 471,

---

[14] As the Fifth Circuit has expressed: "The *Townsend* court expressly adopted *Miles*'s reasoning by recognizing that 'Congress' judgment must control the availability of remedies for wrongful-death actions brought under general maritime law.' The Court could not have been clearer in signaling its approval of *Miles* when it added: 'The reasoning of *Miles* remains sound.'" *McBride v. Estis Well Serv., L.L.C.*, 768 F.3d 382, 390 (5th Cir. 2014) (quoting *Townsend*, 557 U.S. at 419-20).

(2008) . . . , the Court recognized that punitive damages normally are available in maritime cases." *Id.*, at 489-90, 502, 508, n.21.  Relying on *Miles* . . . , the Court today holds that unseaworthiness claims are an exception to that general rule." *Id.* at 377-78 (Ginsburg, J., dissenting).[15]  The Court further concluded that "unlike maintenance and cure, unseaworthiness did not traditionally allow recovery for punitive damages." *Id.*

The *Batterton* reasoning was reiterated by the Supreme Court in *Yamaha,* wherein the Court stated:

> When Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is, we have generally recognized, no cause for enlargement of the damages statutorily provided. See *Miles,* 498 U.S., at 30–36, 111 S.Ct., at 324–328 (Jones Act, rather than general maritime law, determines damages recoverable in action for wrongful death of seamen); *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 232, 106 S.Ct. 2485, 2499, 91 L.Ed.2d 174 (1986) (DOHSA, which limits damages to pecuniary losses, may not be supplemented by nonpecuniary damages under a state wrongful-death statute); *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 624–625, 98 S.Ct. 2010, 2014–2015, 56 L.Ed.2d 581 (1978) (DOHSA precludes damages for loss of society under general maritime law).

516 U.S. at 215.

Plaintiffs cite to *American Export Lines, Inc. v. Alvez*, 446 U.S. 274 (1980) and *Pritt v. Air & Liquid Systems Corp.*, No. 19-10651, 2022 WL 902684 (S.D.N.Y. Mar. 28, 2022) in support of their entitlement to punitive damages and loss of consortium damages. (*See* Opp'n to GE Br. at 34-35; Opp'n to Westinghouse Br. at 32-33).  The Court first notes that *American Export Lines* predates the Supreme Court's decisions in *Miles*, *Townsend*, and *Batterton*.  Likewise, *Pritt* is also distinguishable from the present case because it did not address whether punitive or loss of

---

[15] The Court further stated, "[W]e have more recently observed that the Jones Act limits recovery to pecuniary loss. Looking to FELA and these decisions, the Federal Courts of Appeals have uniformly held that punitive damages are not available under the Jones Act." *Batterton,* 588 U.S. 358, 373 (cleaned up).

consortium damages were available in wrongful death actions.  Rather, the plaintiffs raised both naval and civilian claims against the defendant.  2022 WL 902684, at *11.

Accordingly, the Court grants GE and Westinghouse's motion for summary judgment as to the loss of consortium and punitive damage claims.

IV.    **CONCLUSION**

For the reasons set forth above, GE and Westinghouse's motions for summary judgment (ECF Nos. 174, 175) are **GRANTED in part** as to Plaintiffs' claims for punitive damages and loss of consortium damages.  All other claims for relief are **DENIED**.

**DATED:** March 31, 2025

**JULIEN XAVIER NEALS**
**United States District Judge**